UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY WILLIAM DEDEKER,<br><br>Petitioner,<br><br>v.<br><br>STUART SHERMAN,<br><br>Respondent. | No.  2:20-cv-02056-KJM-EFB P<br><br>FINDINGS AND RECOMMENDATIONS <u>THAT THE PETITION BE DENIED</u> |

Petitioner, proceeding *pro se*, brings an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He was charged and convicted in the Nevada County Superior Court of: (1) sodomy of a child 10 years old or younger (Pen. Code §288.7, subd. (a)); (2) oral copulation with a child 10 years old or younger (§288.7, subd. (b)); (3) two counts of lewd or lascivious acts upon a child under 14 years old (§288, subd. (a)); and (4) sodomy of a child under fourteen years old (§286 subd. (c)(1)).

His habeas petition raises one claim of ineffective assistance of counsel.  He contends that counsel should have investigated and presented evidence that the victim's mother, "S.L.," had a prior conviction for making a false accusation of sexual assault.  ECF No. 26 at 4.  Respondent has filed an answer, ECF No. 32, and petitioner has declined to file a traverse.

/////

/////

1

For the reasons stated below, the court recommends that the petition be denied.

## FACTUAL BACKGROUND

The following summation of the facts is quoted from the state appellate court's decision on direct appeal. The court has reviewed the record and finds the appellate court's decision to be consistent therewith.

> A. Prosecution Case
>
> Stormie Lunderville met appellant in 2006 and the two started dating. (1 RT 131.) At the time, Lunderville had two children, including Sebastian L. who was three years old.[1] (1 RT 129-130.) Soon after, Lunderville, Sebastian L., appellant, and appellant's children, including his daughter Taylor, moved into a house together on Deerfield Drive in Truckee, California. (1 RT 131-132.)
>
> According to Lunderville, appellant was primarily responsible for disciplining the children because it was difficult for her to do. (1 RT 177.) Appellant disciplined the children by talking to them, yelling at them, putting them in a corner, and spanking them "every once in a while" with his hand. (1 RT 134, 178.) Sebastian L. recalled that more than a dozen times, appellant disciplined him by hitting him on his "butt" with a belt. (2 RT 244, 246.)
>
> According to Sebastian L., he was six years old the first time appellant sodomized him.[2] (2 RT 247.) Sebastian L. was showering in an upstairs bathroom, which was used primarily by him and Taylor, when appellant entered the bathroom and undressed completely. (1 RT 140; 2 RT 247, 250.) Appellant got into the shower with Sebastian L. and asked Sebastian L. to wash appellant's back. (2 RT 247, 250.) Sebastian L. washed appellant's back as asked. (2 RT 250.) Afterwards, both Sebastian L. and appellant stepped out of the shower and began to dry themselves off. (2 RT 252.) According to Sebastian L., appellant sat down on the bathroom floor and began stroking his own penis. (2 RT 255.) Appellant told Sebastian L. to sit down and Sebastian L. sat down on the floor in front of appellant. (2 RT 256.) Appellant then put his penis into Sebastian L.'s mouth. (2 RT 256.) Appellant moved himself back and forth and moved Sebastian L.'s head back and forth while appellant's penis was in Sebastian L.'s mouth. (2 RT 257-258.) According to Sebastian L., appellant was "trying to . . . ejaculate." (2 RT 257.) Once appellant ejaculated into Sebastian L.'s mouth, Sebastian L. spit in a trash can and sat back down in front of appellant. (2 RT 258-259.)

---

[1] [footnote 2 in original text] Sebastian does not share a last name with Lunderville and respondent will refer to him as Sebastian L. (1 RT 129.)

[2] [footnote 3 in original text] Sebastian L. was 15 years old at the time of the March 2018 jury trial. (2 RT 234.)

Once Sebastian L. sat back down, appellant told him to turn around. (2 RT 259.) When Sebastian L. turned around, appellant "put his penis into [Sebastian L.'s] back side." (2 RT 259.) Sebastian L. felt pain as appellant moved "back and forth, trying to ejaculate in [Sebastian L.'s] back side." (2 RT 260.) According to Sebastian L., appellant ejaculated a second time. (2 RT 260.) After appellant ejaculated, both he and Sebastian L. got dressed and exited the bathroom. (2 RT 260.) The following day, Sebastian L. told his mother what had happened but she acted like she did not believe him. (2 RT 263.)

As Lunderville recalled the day of the incident, she heard Sebastian L.'s shower running when she woke up. (1 RT 139-140.) Lunderville knew Taylor was not at home and she did not see appellant or Sebastian L. anywhere else in the house. (1 RT 138.) Lunderville knocked on Sebastian L.'s bathroom door and asked who was inside. (1 RT 141.) Appellant responded that he and Sebastian L. were inside and would come out in a minute. (1 RT 141-142.) Lunderville found it "odd" that appellant was in the bathroom with Sebastian L. because there was another bathroom in the house that appellant could have used. (1 RT 143.)

Lunderville saw Sebastian L. after he came out of the bathroom. (1 RT 142.) When she asked him what happened in the bathroom, Sebastian L. told her he fell on the floor. (2 RT 267.) Appellant also told Lunderville that Sebastian L. had fallen while in the bathroom. (1 RT 211.) Lunderville and appellant argued for an unrelated reason, and she and Sebastian L. subsequently moved out of the house for about two months. (1 RT 144, 149.) According to Lunderville, during this two-month period, Sebastian L. told Lunderville that appellant "tried to wash him" but did not give her any other details about what had happened in the bathroom. (1 RT 146.) Lunderville called appellant and asked him what had happened between him and Sebastian L. in the bathroom. (1 RT 147.) According to Lunderville, appellant did not tell her what had happened. (1 RT 147.) Lunderville decided she and Sebastian L. would return to live with appellant because he denied that anything inappropriate happened in the bathroom, he promised Lunderville that he would "be a better dad," Lunderville "wanted a family back," and Sebastian L. was not doing well at his new school. (1 RT 150, 184.) Lunderville also hoped appellant would not do anything to Sebastian L. again. (1 RT 152.)

Appellant sodomized Sebastian L. a second time in April 2016 when Sebastian L. was 13 years old. (2 RT 269-270.) According to Sebastian L., one day he asked appellant, "[W]hy does a penis get hard . . . [?]" (2 RT 270.) In response, appellant "explained it like a parent." (2 RT 270.) The following day, appellant came into Sebastian L.'s bedroom with a condom. (2 RT 270.) At the time, Sebastian L.'s "thing was hard" and appellant "tried to put the condom on [Sebastian L.]." (2 RT 270.) According to Sebastian L., the condom did not fit so appellant put the condom on his own penis. (2 RT 272.) Appellant "stroke[d] his dick and then he ejaculate[d]" in front of Sebastian L. (2 RT 273.) Appellant then told Sebastian L. to pull down his own pants. (2 RT 275.) When Sebastian L. did so,

3

appellant "put his dick into [Sebastian L.'s] rear again." (2 RT 275.) According to Sebastian L., this lasted for a few minutes after which appellant left Sebastian L.'s room. (2 RT 276-277.) Appellant told Sebastian L. not to tell Lunderville about what happened. (2 RT 278.)

The following day, while appellant and Sebastian L. were driving home from Reno, appellant showed Sebastian L. photos of naked women on appellant's cell phone. (2 RT 277, 280, 334.) Appellant told Sebastian L. to masturbate. (2 RT 277, 280-281, 334.) Appellant then offered to buy Sebastian L. a new cell phone if Sebastian L. masturbated. (2 RT 282, 329.) Sebastian L. masturbated in the car until appellant told him to stop. (2 RT 281.) Appellant told Sebastian L. not to tell anyone about what happened. (2 RT 282.)

The following week, when Sebastian L. went with his mother to her counseling appointment, Sebastian L. told his mother that appellant "had bribed [him] to masturbate and that [appellant] had tried to put a condom on [Sebastian L.]." (1 RT 162, 195; 2 RT 285.) Lunderville recalled Sebastian L. telling her that appellant showed him pictures of "naked people" and condoms and bribed him with a cell phone. (1 RT 165, 196.) When Lunderville and Sebastian L. returned home, Lunderville confronted appellant about showing Sebastian L. "naked people" and appellant initially denied having done so. (1 RT 165-166; 2 RT 288-290.) Lunderville was upset because although she had asked appellant to discuss erections with Sebastian L., she did not authorize appellant to also discuss masturbation. (1 RT 164, 200, 204.) At some point however, appellant apologized for talking to Sebastian L. about masturbation and for showing Sebastian L. videos of men and women having sex. (1 RT 205.)

After a week, Lunderville became "tired of not getting the truth" from appellant about what happened with Sebastian L., so she and Sebastian L. moved out. (1 RT 166; 2 RT 290.) She told Kaitlin Dodson, appellant's brother's girlfriend, that she and Sebastian L. were leaving and not coming back and she then took Sebastian L. to the police station to give a statement. (1 RT 166-167.)

On May 11, 2016, Sebastian L. was interviewed by a "forensic interview child specialist." (2 RT 364-365, 369.) Sergeant Lisa Madden of the Truckee Police Department watched Sebastian L.'s forensic interview. (2 RT 368.) Sergeant Madden also arranged and listened to a pre-textual phone call between Lunderville and appellant. (2 RT 382, 392.) During this call, appellant admitted that he had twice seen Sebastian L. masturbating. (2 RT 392.)

The next day, Sergeant Madden interviewed appellant. (2 RT 366.) During the interview, appellant denied allegations of sexual abuse. (2 RT 366.) In Sergeant Madden's "training and experience," it was "very common" for suspects to deny allegations of sexual abuse, so Sergeant Madden looked for "inconsistencies" in appellant's statement. (2 RT 367.) One such inconsistency was that appellant denied that he had ever seen Sebastian L. masturbate but later admitted that he had in fact seen Sebastian L. masturbate on multiple occasions. (2 RT 376.)

B. Defense Case

Appellant's mother, Nina Dedeker, testified on his behalf. Mrs. Dedeker saw appellant discipline the children but never saw him use a belt to do so. (2 RT 418.) Mrs. Dedeker had known Lunderville for approximately 13 years. (2 RT 399.) On one occasion, Lunderville told Mrs. Dedeker that housework was completed when in fact it was not. (2 RT 405-406.) This made Mrs. Dedeker question Lunderville's credibility. (2 RT 403.)

Dodson also testified on appellant's behalf. (2 RT 422.) For five and a half years, Dodson lived in the house with appellant, Lunderville, and Sebastian L. (2 RT 422.) Dodson never saw appellant say "mean things" to the children living in the house or hit them with a belt. (2 RT 443.) On one occasion, Sebastian L. admitted to Dodson that he had lied to her about something because Lunderville asked him to do so. (2 RT 429.) A few days before appellant was arrested, Lunderville told Dodson that Lunderville "was going to go to the police the next day and file charges against [appellant] saying that he touched Sebastian." (2 RT 434.)

Lisa Heinzenrader, appellant's aunt, described appellant as fun-loving and caring. (2 RT 461-462.) According to Heizenrader, appellant and Sebastian L. got along well and it was not consistent with appellant's character to hit children with a belt. (2 RT 470.)

Robert Johnson had known appellant since 1994. (3 RT 536.) Johnson's wife, Ashley Johnson, had known appellant for six and a half years. (3 RT 527.) The Johnsons saw appellant, Lunderville, and Sebastian L. at holiday and family gatherings. (3 RT 528.) Mr. Johnson believed that appellant and Sebastian L. had a good relationship. (3 RT 541-542, 545.) Neither of the Johnsons saw Sebastian L. act as though he feared appellant. (3 RT 495, 542.)

C. Rebuttal Case

On October 6, 2007, Officer Mark Victors and a Child Protection Services representative spoke with Sebastian L. and Taylor. (3 RT 521-522.) Sebastian L., four years old at the time, said that appellant disciplined both children by hitting them with a belt. (3 RT 522.)

ECF No. 33-6 at 12-17.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.   Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

/////

/////

5

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A. "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

B. "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[3] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[4] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[5] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (plurality op'n).

/////

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

[4] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[5] *Faretta v. California*, 422 U.S. 806 (1975).

7

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Harrington*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must

8

determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Harrington*, 562 U.S. at 101-102.

      C.    "Unreasonable Determination of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004). Moreover, if "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2). *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), cert. denied, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), cert. denied, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S.

at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II. The Relationship of § 2254(d) to Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the ' 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute

or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

## DISCUSSION

As stated above, petitioner argues that his counsel was ineffective in failing to present evidence that the mother of the victim had a prior conviction for making a false sexual assault allegation.

I. Last Reasoned Decision

This claim was raised in a habeas petition before the state superior court and rejected:

> In his petition Dedeker asserts that his appointed trial counsel was ineffective because he elected not to attack the credibility of the mother of the child victim with information that she had previously made false accusations of being raped, and that she had not been truthful about an incident in which other children at the home she shared with Dedeker had been shot with an airsoft gun. Dedeker's appointed trial counsel, Deputy Public Defender David Humphreys, submitted a declaration filed with Dedeker's petition. In his declaration, DPD Humphreys, an attorney with more than four decades of experience as a public defender, stated that he was aware of the false rape allegations, but made the tactical choice not to raise that issue to attack Ms. Lunderville's veracity at trial because Ms. Lunderville's testimony about how she learned from her son of his claims of having been molested by Dedeker was neither assailable nor material to the case against Dedeker. DPD Humphreys further stated that he elected not to focus on the airsoft gun incident because he determined that attacking Ms. Lunderville's conduct of staying in a relationship with Dedeker after she became aware of the child/victim's allegations of being molested by Dedeker was "a better approach to attack her credibility."
>
> The Court invited informal responses from both the Nevada County District Attorney and the Nevada County Public Defender. The District Attorney filed its informal response on May 17, 2019. The Nevada County Public Defender did not file an informal response. Dedeker's time to file his reply to that informal response expired on June 7, 2019. The court having read those pleadings, and having taken notice of its own file in the trial of this matter, the petition for writ of habeas corpus will be DENIED for the reasons set forth below.
>
> Discussion
>
> Our Supreme Court in *People v. Pope* (1979) 23 Cal.3d 412 and *People v. Wilson (1992)* 3 Cal.4th 926 described this court's proper role in these proceedings as follows: "[W[hen the record on appeal does not illuminate the basis for the attorney's challenged acts or

11

omissions, a claim of ineffective assistance of counsel is more appropriately made in a habeas corpus proceeding, in which the attorney has the opportunity to explain the reasons for his or her conduct. 'Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.'" *Wilson*, 3 Cal.4th at 936.

Dedeker bears the burden in these proceedings to show that DPD Humphreys failed to act in a manner that would be expected of a reasonably competent attorney acting as a diligent advocate, and that it is reasonably probable that a more favorable determination for Dedeker would have resulted absent the challenged acts or failures to act. *People v. Lewis* (1990) 50 Cal.3d 262, 288. Dedeker fails to satisfy either prong of that analysis to establish a viable claim of ineffective assistance of counsel ("IAC").

"A court reviewing the conduct of counsel must in hindsight give great deference to counsel's tactical decisions." *People v. Holt* (1997) 15 Cal.4th 619, 703. "[W]e assess both the reasonableness of the decisions and the reasonableness of the investigation that underlay each decision." *In re Thomas* (2006) 37 Cal.4th 1249, 1258.

Here, DPD Humphreys was aware through his investigation of the information now seized upon by Dedeker in these writ proceedings that might have been used to further impeach the mother of the child/victim, Ms. Lunderville, at trial. The investigation appears to have been adequate and reasonable.

DPD Humphreys elected to use other available information to assail Ms. Lunderville's veracity and the quality of her motherhood: information that DPD Humphreys evaluated to be more likely to damage Ms. Lunderville's credibility before the jury. That tactical decision was well within the range of reasonable choices that could have been made by a competent and experienced attorney according to prevailing professional norms. Consequently, Dedeker's claim to IAC founders on that first prong of the analysis.

As to the second prong, Dedeker fails to connect his argument that additional impeachment of Ms. Lunderville would somehow have created a probability that a reasonable juror or jurors would have concluded that the victim who testified about the serial abuse by Dedeker in this trial did so untruthfully. As the District Attorney observed in its informal response, this case did not turn on the

testimony of Ms. Lunderville. The case turned instead on the believability of the child victim.

Nothing in the information that Dedeker now raises as to Ms. Lunderville involved claims that Ms. Lunderville coerced her child to lie on her behalf. The information would instead impeach Lunderville on collateral matters, when the subject of her testimony was peripheral to the issues on which any competent defense attorney would have thought the case would turn. As the impeachment testimony about Ms. Lunderville bore no connection to the

12

> child/victim, no reasonable juror could have reasonably relied on that information to assail the veracity of testimony at trial by the child/victim. Consequently, a more favorable result for Dedeker does not inhere from a decision to utilize that information to further impeach Ms. Lunderville, and Dedeker cannot meet the second prong of the analysis to establish a valid claim of IAC.
>
> Conclusion
>
> On this record Dedeker has failed to meet his burden to establish that the tactical choices made by DPD Humphreys fell outside the scope of those expected of a reasonable attorney under prevailing professional norms, and Dedeker has failed to establish that a probable more favorable result would have come from the use of the additional information to further impeach Ms. Lunderville at trial.

ECF No. 33-12 at 2-5. This claim was raised again before the California court of appeal, ECF No. 33-13, and the California Supreme Court, ECF No. 33-15. Both courts issued summary denials of the claim, leaving the superior court's rejection as the last reasoned decision. ECF Nos. 33-14 & 33-16.

    II.    <u>Clearly Established Federal Law</u>

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687-88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

/////

### III. Analysis

The superior court's rejection of this claim was not unreasonable. It found that petitioner's counsel had adequately investigated the victim's mother's prior conviction, but chose to attack her credibility with other evidence. As respondent points out, such tactical decisions made after a thorough investigation of the law and the facts are "virtually unchallengeable." *Strickland*, 466 U.S. at 690-691. And petitioner has offered no counterargument to the superior court's conclusion that it was the victim's testimony, not his mother's, that undergirded his convictions. Thus, he has failed to show that the failure to present the prior conviction evidence would have changed the outcome of his trial.

### CONCLUSION

For the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. *See* 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 15, 2022.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE